## West Kentucky Coal Company, et al. v. Heady's Administrator.

(Decided January 4, 1917.)

### Appeal from Webster Circuit Court.

Master and Servant—Operation of Cars at Coal Mines—Contributory Negligence.—An employe of a coal mine, whose business it was to move cars under a tipple, was charged with the duty of taking notice of the movement of empty cars on the incline track on which the cars were brought from a siding to the tipple, and in going between cars where he was killed at a time when he knew or should have known that they would come together, he was guilty of such contributory neglect as would defeat a recovery in behalf of his administrator.

BARRET, ALLEN & ATTKISSON, EUGENE R. ATTKISSON, ALLEN & ALLEN and BAKER & BAKER for appellants.

O'DOHERTY & YONTS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

At a tipple at one of the appellant company's mines at Wheatcroft, in Webster county, Ross Henry Heady, while engaged at work for the coal company, was crushed to death between the couplings of two railroad coal cars, and in this suit by his administrator to recover damages for his death there was a judgment for $3,200 against the coal company and the appellant William Owens, through whose negligence, as alleged, the accident happened.

On this appeal several grounds for a reversal are relied on, but as we have reached the conclusion that the peremptory instruction asked by counsel for the coal company and Owens should have been given by the court, we may confine this opinion to a statement of the reasons that induce us to believe that the administrator, as plaintiff below, failed in his evidence to make out a case for the jury.

At the time of the death of Heady, a bright, intelligent, capable young man who had been working at and about the tipple in work of various kinds for a year or more, he was employed to move cars, after they had been loaded, from under the tipple and to put in place of the loaded cars, empty cars. This work he performed with an implement known as a pinch bar, which he placed on the rail under the wheel and by pressure on the handle started the standing car or cars in motion, and the cars, after being put in motion by this effort, ran of their own momentum to the place it was desired they should stop, as the track was on a down grade in the direction in which the cars were moved.

Some half a dozen men, or probably a few more, were engaged in work about the tipple, and each of these men had separate duties to perform. The tipple into which the coal was dumped after being brought from the mine in little cars was elevated above the railroad track, and the coal when dumped into the tipple from the mine cars was, by a process not necessary to explain, emptied into the railroad cars standing on the track immediately underneath the tipple. The tipple and tracks were so arranged that three cars could be loaded at the same time, but at the time of the accident, only one car was being loaded, and the loading of this car was in charge of a man named Walker. Standing on the track and immediately east of and against the

car being loaded there was an empty coal car to take
the place of the one being loaded after it had been
loaded. And standing in this empty car at the east end
of it was Buck Heady, the father of Ross Henry Heady,
whose duty it was to bring the empty cars from a sid-
ing several hundred yards off, down to the tipple as
they were needed. Between fifty and seventy-five feet
east of the empty car in which Buck Heady was stand-
ing and that will be designated as car two, there was
another empty coal car standing on the same track, and
this car will be designated as car three. About three
hundred and fifty yards east of car number three and
on the same track, there were standing two empty coal
cars.

At the time, however, that young Heady was killed,
William Owens, the appellant, acting, as he claims, for
and at the request of Buck Heady, undertook to and did
bring these two empty coal cars down to the place at
which it was intended to stop them near the tipple. To
bring these two cars down the track towards the tipple
it was only necessary to release the brakes and give
them a little start with a pinch bar, whereupon they
would roll of their own momentum on the down grade
from the place where they were started to the tipple.

It might here be said that Buck Heady denies that
he gave Owens any directions or instructions whatever
to bring these two cars down, although Owens says he
did.

The case for the administrator was put upon the
ground that Owens was acting in the capacity of tipple
foreman, or, at any rate, was an employe of the com-
pany superior in authority to Ross Henry Heady, and
that the death of Heady was caused by his negligence
in failing to exercise ordinary care to keep the cars as
they came down the track under control and to keep a
reasonable lookout for persons on the track. And it
was upon this theory that the case for the plaintiff went
to the jury.

The evidence upon the subject whether Owens was
superior in authority to or a fellow servant of Ross
Henry Heady and the other men working at the tipple
is very conflicting, but in the view we have of the case
the relation he occupied is not important, and so we
may assume that he was superior in authority to Ross
Henry Heady.

On what some of the witnesses say was the left side of the track and near the east end of car two, there was a large rock situated about eight feet from the track, and on this large rock Ross Henry Heady was seen sitting a few moments before he was killed by being crushed between the coupling on the east end of car two and the coupling on the west end of car three, when car three, which had been standing some fifty or seventy-five feet from car two, was pushed against car two by the two cars that Owens brought down, when these two cars struck the east end of car three. There is some dispute in the evidence as to the speed at which the two cars Owens brought down were running when they struck car three and shoved it against car two, and also the speed at which car three was running when it bumped into car two. Some of the witnesses say that these two cars came down the track at a speed of about six miles an hour, while others say about two miles an hour. But that these cars at no time were running at a high rate of speed is made plain by the physical fact that the car being loaded, and which was held in place by a wooden chock placed on the rail under the wheel, was not removed from its position when car three struck car two, which was coupled to, or, at any rate, was standing against the car being loaded.

It might also be here noticed that Owens testified that he did not see Ross Henry Heady at any time while he was bringing down the cars, nor did he give any warning of their movement. He says that he was standing on the platform between the two cars he was bringing down, as the brakes for each car were at that place, while Buck Heady says he was on the rear end of the last car. But where he was situated on the cars is not so material unless he was under some duty to give notice of the approach of the cars to any person who might be on or about the track.

For what purpose Ross Henry Heady left the rock on which he was sitting and went between cars two and three just a moment before they came together, the record does not disclose. He may have gone between the cars for the purpose of closing the knuckle pin on the east end of car two, as it was a part of his duty to do, or he may have started across the track to get his pinch bar, which was lying on the opposite side of the track from where he had been sitting. But whatever his purpose was he unfortunately happened to be in the

middle of the track when car three struck car two and was caught between the couplings of these two cars and instantly killed.

His father, Buck Heady, who was standing on the east end of car two, almost directly over the place where his son was killed, in testifying for the administrator, related what happened at the time of and immediately preceding the accident as follows: He said that the car underneath the tipple that was being loaded, was about two-thirds full, and that there was an empty car (car two) just east of and against this car that was being loaded, and that fifty or seventy-five feet east of car two was an empty coal car (car three). "Q. Where was your boy the last time you saw him before he was killed? A. Sitting on a rock on the left hand side of the track. Q. How far was that rock from the track? A. Never measured it. About eight feet, I would think. Q. Did you see him move after that until he was crushed? A. No, sir. Q. I will ask you whether after this car under the tipple was loaded, your boy had any duties to perform. A. Yes, sir; he put the next one under. Q. Before putting the next one under did he have any duty with reference to the empty car? A. Yes, sir. When this one was loaded I would drop one down and the boy would get behind this empty and pinch both the cars through. Q. Did he have any duty with reference to closing the knuckles of the cars? A. It was his duty to keep the knuckles closed in order to keep the knuckles from coupling. Q. Did you notice where your boy's pinch bar was lying just before the accident? A. No, sir; I noticed it afterwards on the right hand side of the track lying on a tie. Q. Where were you at the time of the accident? A. On the car right over the boy. The car against the one they were loading. Q. In which direction were you looking just before the accident? A. Down towards the man that was loading the cars, George Walker. Q. Did you know that Owens was going to bring down any cars? A. No, sir. Q. I will ask you what first directed your attention to Owens that he was bringing them down? Did you hear or see anything that would call your attention to them? A. Not until he struck the car (car three) fifty or seventy-five feet away. That attracted my attention. Q. Was the noise of the striking of the two cars much or a small noise? A. It was right smart noise. Q. Where was Owens at the time the two cars collided with this empty car you

say was sixty feet from you? A. On the back end of the two cars he was bringing down. Q. When he collided with this empty car, what happened to the car? A. He brought it on down. Q. How fast were the cars traveling between the time the two cars struck the one car and the time he collided with them? A. I should think six miles an hour. Q. Did you know your boy was anywhere on the track? A. No, sir. Q. Had you seen him at all? A. No, sir. Q. If your face had been towards Owens and you had been looking east on the track, could you have seen your boy? A. Sure, I could. Nothing to hinder me. Q. What was it directed your attention to the fact that your boy was hurt? A. He holloaed. Q. Where did the outcry come from? A. Came from under my feet. Q. Up to that time did you know where your boy was? A. I did not. Q. Considering the distance the cars ran, and the manner in which they came down the incline, and the speed at which you say they came down the incline, could a person of ordinary hearing have heard the cars approach? A. I think not. Q. Did you hear them? Not until they struck the car. Q. Are you a person of good hearing? A. Not extra good hearing.''

Walker, the only other witness for the plaintiff except Key and Oakley, whose evidence it is not important to notice in describing what happened when the accident occurred, said he was on a car which was just about loaded at the time of the accident, and that it was a part of his duty to notify Ross Henry Heady to "pinch down" cars. That realizing that he would need another car in a few minutes, he turned around so that his face was in the direction of Ross Henry Heady, to whom he intended to give a signal to bring on another car. That when he turned around he saw Buck Heady sitting on the east end of the empty car (car two) with his hands on the brakes, and at the same time saw Owens coming down the incline with the empty cars. He further said that Owens, when he started down the incline with the cars, could have seen Ross Henry Heady, but when he, Walker, looked, he did not see him, although he knew he was at his post of duty.

Mrs. Black, a witness for the coal company, said that she was standing on the porch of a house and had a full view of the premises where the accident occurred and saw the cars in charge of Owens coming down the track faster than usual, but that they slowed down. "I

saw the boy get up and he seemed to rush out of my sight behind the car and his father holloaed he was killed. Q. How fast were they going at the time you saw this boy get up? A. They were running about like they usually do. Q. In what direction did this boy go when he got up? A. He went towards the cars. Q. Did you see him go between the cars? A. No, sir. Q. Could you say how far the cars were away at the time he got up and started towards the track? A. No, sir. Q. How soon was it after you saw him get up and you heard his father holloa? A. Didn't seem very long to me.''

J. W. Mitchell, an employe of the company, in testifying for it, was asked and said: ''Q. Where were you at the time the accident happened? A. Up in the tipple. Q. When did you see Ross Henry Heady just prior to the accident? A. I saw him sitting on the well rock. Q. About how far from the track? A. Some seven or eight feet. Q. At the time you saw him there at the rock did you see his father, Buck Heady? A. No, sir. Q. Where was he? A. Sitting on the empty car next to the loaded car. Q. Did you see Mr. Owens? A. Yes, sir. He was bringing two empties down. Q. Did you see him when he connected with the empty car (car three)? A. Yes, sir. Q. At the time, or about the time the two cars Owens was bringing down bumped into the third empty car (car three), did you see Ross Henry Heady, and if so, what became of him? A. He got up from off the well rock. Q. In which direction did he start? A. Towards the car that Mr. Buck Heady was on. Q. How far had the three cars traveled toward the tipple before he got up and started in that direction? A. When Mr. Owens bumped into the other empty car (car three) he got up and started toward the other cars. Q. I believe you said he was going towards the car on which Buck Heady was sitting? A. Yes, sir. Q. Did you see Ross Henry Heady after he started toward the car on which his father was standing? A. No, sir. Q. What character of noise did the cars make when they came in contact with the third car (car three)? A. Right smart noise. Q. Did you hear that? A. Yes, sir. Q. Then, if I understand you correctly, when those cars Mr. Owens was bringing bumped into this car (car three), is when you saw Ross Henry Heady get up off the rock and start in this direction? A. Yes, sir.''

These two witnesses, Mitchell and Mrs. Black, were the only persons who saw Ross Henry Heady leave the

rock on which his father saw him sitting and go towards the track about the time the cars Owens was bringing down bumped against car three.

It is further shown that empty cars were brought down this incline in the manner that Owens was bringing them down, many times each day, while the tipple was in operation, and while there is some evidence that these cars were running about six miles an hour, it is manifest that under the circumstances the operation of the cars at this rate of speed, assuming they were traveling that fast, was not negligence.

There is also some evidence tending to show in a vague, unsatisfactory manner that the tracks at this place were crossed by the people about the tipple quite often during the day. But there is no evidence that the tracks at this place were used by such a large number of persons as to put on men bringing the cars down the duty of anticipating the presence of persons on the tracks, or to take the usual precautions required to protect persons on tracks when the conditions require that a lookout shall be kept and warning given.

Nor is there any evidence that it was customary to give any notice of the movement of cars on this incline, or to have a person stationed on the front end for the purpose of warning any person who might happen to be on or near the track in a place of danger, or that Ross Henry Heady had any right to depend on any warning or signal of the movement of the cars. On the contrary, the work in which he was engaged required him, in the exercise of ordinary care for his own safety, to keep a lookout for the movement of the empty cars coming down the incline.

The record is entirely silent on the subject whether Ross Henry Heady saw these cars that Owens was bringing down as they approached car three, but whether he saw them coming or not he could not help hearing the collision between these cars and car three, as all the witnesses who were inquired of on this point said they heard the noise when these two cars struck car three, and several of these witnesses were much farther off from the place of collision than Heady was. And yet after being advised of the presence of these cars by the noise of the collision, if in no other way, he went, for some unexplained reason, between cars two and three and evidently close to the east end of car two, and also, for some unexplained reason, failed to get out of the

way before car three ran the distance of fifty or seventy-five feet and came in contact with car two.

Under the facts as we have stated them, we think a peremptory instruction should have been given for two reasons: First, because no negligence was shown on the part of Owens or in the movement of the cars down the incline; and, second, because Ross Henry Heady, who should have taken notice of the movement of cars on this incline, voluntarily left a place of safety and went into a place of danger at a time when he knew, or should have known, that car three would bump into car two.

Wherefore, the judgment is reversed, with directions to grant a new trial, and if there is another trial and the evidence is substantially the same as appears in this record, the court will, at the conclusion of all the evidence, direct the jury to find a verdict for the defendants.